UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

v.

GARY FAMA,

      Defendant.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**
12-CR-186 (WFK)

**WILLIAM F. KUNTZ, II, United States District Judge:**

On December 17, 2012, following a six-day trial, a jury found Gary Fama ("Defendant") guilty of armed bank robbery and use of a firearm to commit a crime of violence. This Court sentenced Defendant to 420 months of imprisonment to be followed by five years of supervised release, and ordered Defendant to pay $5,658.00 in restitution and a $200.00 special assessment. Defendant appealed, among other things, his sentence. The Court of Appeals for the Second Circuit vacated the sentence and remanded the case for resentencing. A *Fatico* hearing was scheduled for August 15, 2016, but was repeatedly adjourned at the parties' requests. In lieu of the hearing, the Court held a status conference to assist in its resentencing of Defendant. The Court now provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress and the President and contained in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is hereby resentenced to 78 months of incarceration for armed bank robbery, seven years for use of a firearm to commit a crime of violence, five years of supervised release, $5,658.00 in restitution, and the $200.00 special assessment.

## BACKGROUND

### I. Armed-Robbery Conviction

On December 29, 2011, Defendant and his co-defendant, Jack Mannino, robbed a Capital One Bank in Brooklyn, New York. On December 17, 2012, following a six-day trial, a jury found Defendant guilty beyond a reasonable doubt of armed bank robbery and use of a firearm to commit a crime of violence. *See* Jury Verdict, ECF No. 66. On August 1, 2014, the Court sentenced Defendant to an above-Guidelines 420 months of incarceration, five years of supervised release, restitution in the amount of $5,658.00, and the $200.00 mandatory special assessment. J., ECF No. 92.

1

**II. Defendant Fama's Appeal**

Defendant appealed, challenging, *inter alia*, the Court's 420 month sentence as procedurally unreasonable because the Court did not "adequately" explain its reasons for the above-Guidelines sentence. *United States v. Fama*, 636 Fed. Appx. 45, 49 (2d Cir. 2016). The Court of Appeals for the Second Circuit expressed no view on the substantive reasonableness of this Court's sentence, but found "the district court plainly did not meet its higher descriptive obligation in the circumstances here" because the Court deviated from the advisory Sentencing Guidelines range of 147 to 162 months of incarceration. *Id.* at 49.

The Court of Appeals provided a proportionality requirement: the greater the degree of variance from the advisory Guidelines sentencing range the greater the justification required from the Court. *See id.* ("Critically, when a district court deviates from an advisory Guidelines range, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)); *id.* ("For a major variance, the district court bears a 'higher descriptive obligation.'" (quoting *United States v. Cassesse*, 685 F.3d 186, 193 (2d Cir. 2012)). Specifically, the Court of Appeals found the Court's oral explanation of Defendant's extensive criminal history, lack of remorse, and an uncharged bank robbery insufficient to support the Court's 420-month sentence.[1] *Id.* at 50.

---

[1] On the Statement of Reasons form, the Court marked five "Reason(s) for Sentence Outside the Advisory Guideline System": (1) "the nature and circumstances of the offense and the history and characteristics of the defendant pursuant to 18 U.S.C. § 3553(a)(1)"; (2) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" pursuant to 18 U.S.C. § 3553(a)(2)(A); (3) "to afford adequate deterrence to criminal conduct" pursuant 18 U.S.C. § 3553(a)(2)(B); (4) "to protect the public from further crimes of the defendant" pursuant 18 U.S.C. § 3553(a)(2)(C); and (5) "to provide the defendant with

On remand, the Court scheduled a *Fatico* hearing to provide the parties with an opportunity to further inform the Court before resentencing. *See* ECF Nos. 107–108, 110–111.

### III. Status Conference

On September 1, 2016, the Court held a status conference wherein the parties waived a *Fatico* hearing and announced a resolution to resentencing conditioned upon Defendant's allocution to his guilt. ECF Entry Sept. 1, 2016. The Court now provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress and the President and contained in 18 U.S.C. § 3553(a).

## DISCUSSION

### I. Legal Standard

Section 3553 of Title 18 of the United States Code outlines the procedures for imposing sentence in a criminal case. When the District Court imposes a sentence outside of the Sentencing Guidelines range, the Court "shall state in open court the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The Court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form[.]" *Id.*

"The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under [Section] 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal quotation marks and citation omitted). Section 3553(a) provides a list of reasons for the Court to consider in choosing what sentence to

---

needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" pursuant 18 U.S.C. § 3553(a)(2)(D). Statement of Reasons at 3, ECF No. 93.

impose on a criminal defendant. The Court addresses each of the seven 18 U.S.C. § 3553(a) factors in turn.

## II. Analysis

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The first § 3553(a) factor considers "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The Court finds a significant sentence is justified under this factor.

#### a. History and Characteristics of Defendant

Defendant was born on November 30, 1965 in New York, New York, to Joseph Fama and Clorinda Barbara (nee Costanzo) Fama, and grew up in a residential section of Bensonhurst, New York. PSR ¶¶ 50–51. In April of 1984, federal authorities arrested Defendant's parents and four siblings. *Id.* ¶ 54. A search of the family home revealed five kilograms of heroin, two kilograms of cocaine, one hundred pounds of marijuana, nineteen handguns, four rifles, five shotguns, and ammunition. *Id.* Defendant's father, Joseph Fama, was convicted and sentenced to twenty years of custody, and died of a heart attack in 1992 while in federal custody. *Id.* ¶¶ 50, 54. Defendant's mother, Clorinda Barbara Fama, was convicted of drug charges and sentenced to 144 months of custody. *Id.* ¶ 54. She passed away on November 28, 2012 from heart failure, while Defendant was in custody for the instant offense. *Id.* ¶¶ 50, 53. Defendant's siblings were also convicted and sentenced: Toni Ann was sentenced to twelve months of custody; Joseph Jr., thirty months of custody; and Daniel, fifty-seven months of custody. *Id.* ¶ 54. Defendant and his brother, Lee, were not indicted in connection to the matter, but Lee was later sentenced in another case in the Eastern District of New York to six months of incarceration and three years of supervised release for distribution of marijuana. PSR ¶¶ 52, 54; Gov't Sentencing Mem. at 5.

Defendant has an extensive criminal history spanning his entire adult life. In 1984, at the age of eighteen, Defendant was arrested three times. *See* PSR ¶¶ 32, 43, 44. On April 30, 1984, Defendant was arrested for, but ultimately acquitted of, possession of a controlled substance. *Id.* ¶ 43. On May 30, 1984, Defendant was arrested Conspiracy to Possess with the Intent to Distribute Heroin, but the charge was ultimately dismissed. *Id.* ¶ 44. On December 3, 1984, three days after his nineteenth birthday, Defendant was arrested for Disorderly Conduct and was conditionally discharged on May 17, 1985. *Id.* ¶ 32.

In 1986, Defendant was arrested twice. *See id.* ¶¶ 33, 45. On March 3, 1986, Defendant was observed driving a vehicle with burglar tools on a suspended license, and was arrested and later convicted of Disorderly Conduct. *Id.* ¶ 33. On February 25, 1987, Defendant was sentenced to a $150.00 fine, which he paid. *Id.* On May 8, 1986, Defendant was arrested for Criminal in Possession of a Controlled Substance in the Seventh Degree. *Id.* ¶ 45. The charge was dismissed on December 11, 1986. *Id.*

On April 7, 1987, at the age of twenty-one, Defendant was arrested pursuant to an arrest warrant issued for multiple cocaine sales. *Id.* ¶ 34. A local presentence report, dated September 22, 1987, reveals Defendant sold cocaine on six different occasions between July 6, 1986 and August 29, 1986 to undercover agents of the Drug Enforcement Administration ("DEA"). *Id.* Specifically, on August 6, 1986, Defendant sold three ounces of cocaine for $3,600.00 to an undercover DEA agent. *Id.* On August 20, 1986, Defendant sold four ounces of cocaine for $4,800.00 to an undercover DEA agent and later sold another two ounces of cocaine for $2,400.00 with two co-defendants. *Id.* On September 25, 1986, Defendant and a co-defendant sold nine ounces of cocaine for $8,000.00 to an undercover DEA agent. *Id.* On September 26, 1986, Defendant and a co-defendant sold six ounces of cocaine for $6,600.00 to an undercover

DEA agent. *Id.* On April 7, 1987, Defendant sold an unknown amount of cocaine to an undercover DEA agent for $8,000.00. *Id.*

An indictment was brought against twenty defendants, including Defendant's brother and mother. *Id.* In the course of the investigation into the cocaine sales, authorities found approximately $1,000,000.00 cash at the Fama house. *Id.* Defendant was charged with two counts of Criminal Sale of a Controlled Substance. *Id.* He pled guilty to both counts and was sentenced on October 20, 1987 to an indeterminate custodial term of five years to life on the first count and forty-two months custody on the second. *Id.* While incarcerated, Defendant incurred thirteen disciplinary infractions, resulting in 175 days of loss of various privileges, 147 days of confinement to his cell, and 365 days of solitary confinement due a physical altercation with another inmate. *Id.*

Defendant was also sentenced to a lifetime of parole, beginning upon his release on February 13, 1996 and resulting in numerous violations. *Id.* These violations, intertwined with Defendant's many other encounters with the law, resulted in intensive surveillance of Defendant. *Id.* The parole officer supervising Defendant's parole recalled suspicious activity between 1997 and 1999, which the parole officer feared indicated Defendant's return to selling marijuana. *Id.*

On February 1, 1997 at approximately 2:00 A.M., Defendant was caught by the New York Police Department ("NYPD") at a safety checkpoint driving on a driver's license that became suspended because of twenty-six scofflaws levied on eleven dates. *Id.* ¶¶ 34–35. Defendant was charged with Aggravated Unlicensed Operation of a Motor Vehicle in the Second Degree and incarcerated on May 1, 1997 for fifteen days. *Id.* ¶ 35. Defendant failed to notify his parole officer of this arrest and of his failure to abide curfew, resulting in Defendant's first violation of release dated February 13, 1997. *Id.* ¶ 34.

On September 17, 1997, Defendant allegedly punched his common-law wife, Stella Leone, in the face repeatedly. *Id.* ¶ 34. Defendant was arrested for assault. *Id.* The same day, Defendant submitted a positive drug test for morphine. *Id.* As a result, Defendant was instructed to attend a substance abuse program. *Id.* Defendant failed to attend, and again failed to abide curfew. *Id.* As a result, Defendant was found to have violated parole again. *Id.* ¶¶ 34, 46. On September 22, 1997, Staten Island Criminal Court held a violation hearing. *Id.* ¶ 34. The outcome of that hearing is unknown. *Id.*

On July 10, 1998, Defendant violated parole again when he was arrested for striking Stella Leone on the head while attempting to restrain her. *Id.* Ms. Leone had undergone knee-and-hip replacement surgery, and became addicted to pain medication. *Id.* At the time of Defendant's arrest, Ms. Leone was under the influence of pain medication and steroids. *Id.* After an extensive investigation, the Parole Division determined that no warrant should issue for Defendant. *Id.*

On January 18, 2000, at approximately 10:27 A.M., two men in ski masks robbed the Greenpoint Savings Bank branch on New Utrecht Avenue in Brooklyn, New York, at gunpoint. *Id.* ¶ 36. Notably, the Greenpoint Savings Bank is the same physical bank structure as the Capital One bank in the instant case. Gov't Sentencing Mem. at 3. The men carried a loaded revolver and a loaded pump shotgun. *Id.* ¶ 36. During the robbery, one man held up the bank as another jumped over a counter and forced bank employees to hand over $9,450.00 in cash. *Id.* The two men fled in a Lincoln automobile bearing a New Jersey license plate. *Id.* A subsequent search of the National Crime Information Center revealed the vehicle had been reported stolen on January 11, 2000. *Id.*

On January 22, 2000, an employee of the Greenpoint Savings Bank's security division received an anonymous telephone call from a female advising the employee that Defendant robbed the bank and drove a Lincoln automobile. *Id.* Moreover, a confidential source for a joint task force between Federal Bureau of Investigation ("FBI") agents and NYPD detectives informed agents of the task force that Defendant was recruiting for the robbery of the bank. *Id.* On January 24, 2000, law enforcement established surveillance of Defendant's residence, which confirmed the location of a Lincoln automobile. *Id.* On January 26, 2000, law enforcement agents executed a search warrant. *Id.* The search revealed, among other things, documents bearing the name of Defendant, a loaded Smith and Wesson .38 Special caliber revolver, five .38 caliber bullets, a loaded Mossberg 12-gauge pump shotgun, five shell casings of buck shot, a set of keys to a Cadillac bearing the same plate number as those furnished to the Brooklyn District Attorney's office via a confidential source, a key to a Lincoln vehicle, and a gym bag with two handheld radios, two ski masks, and two leather gloves. *Id.* The search did not reveal any cash linking Defendant to the robbery. *Id.* Defendant was arrested on February 23, 2000 pursuant to an arrest warrant. *Id.*

On December 17, 2012, a jury found Defendant guilty beyond a reasonable doubt of armed bank robbery and use of a firearm to commit a crime of violence. *See* Jury Verdict, ECF No. 66. On August 1, 2014, Defendant was sentenced to fifty-one months of incarceration and three years of supervised release. *See* J. While incarcerated, Defendant incurred four disciplinary infractions: (1) being insolent to a staff member, resulting in fifteen days disciplinary segregation and forty-five days loss of commissary and visits; (2) assault without serious injury, resulting in fifteen days disciplinary segregation and sixty days loss of commissary; (3) refusing to obey an order, resulting in thirty days loss of commissary; and (4)

possessing an unauthorized item, resulting in thirteen days disciplinary good conduct, seven days disciplinary segregation, and thirty-days loss of telephone. *Id.*

Defendant was released on November 17, 2003, and placed on supervised release in the Eastern District of New York. *Id.* Defendant violated the conditions of his release multiple times. On July 21, 2004, Defendant operated a motor vehicle without a license and failed to abide by curfew. *Id.* ¶ 34. According to a Violation of Supervised Release Report dated January 14, 2005, Defendant tested positive for cocaine and morphine, changed residences without notifying his supervising officer, and failed to report to the Probation Department. *Id.* 36.

Defendant violated the conditions of his supervised release again on January 23, 2005, when he and a co-defendant were stopped by United States Border Patrol agents and arrested for Criminal Possession of Marijuana in the First Degree. *Id.* The vehicle contained nineteen pounds of marijuana in the trunk. Gov't Sentencing Mem. at 4. Defendant pled guilty and was sentenced to time served (four days) and fined $1,000.00. PSR ¶ 36; Gov't Sentencing Mem. at 4. In addition, according to another Violation of Supervised Release Report dated August 14, 2008, Defendant tested positive for morphine, marijuana, cocaine, and hydromorphine on various occasions, and failed to participate in drug treatment. PSR ¶ 36. Defendant was sentenced to eight months of custody. *Id.*

On April 15, 2010, Defendant attempted to tamper with evidence by concealing a bottle of liquid inside his pants, but he ultimately did not submit the required drug specimen. *Id.* ¶ 34. Defendant's parole officer confronted him, and Defendant admitted that he began using heroin again. *Id.* Defendant's parole was revoked, and Defendant was restored to parole supervision on April 19, 2010. *Id.*

### b. Nature and Circumstances of the Offense

In 2000, while imprisoned at the Metropolitan Detention Center in Brooklyn, New York, for Felon in Possession of a Firearm, Defendant met Jack Mannino, who was serving a twelve-year sentence for robbing twenty-three banks. *Id.* ¶ 3; Govt. Sentencing Mem. at 2, ECF No. 87. The two became friends, remaining in contact with one another after serving their respective terms in prison. *Id.* Mannino was released in July 2011, after spending an additional eight months in prison for violating supervised release, and met with Defendant at a P.C. Richard's store in Brooklyn, New York, shortly after his release. *Id.* During this meeting, Mannino obtained Defendant's contact information and purposely misspelled Defendant's name as "Gari" (or "Garri")—finding the spelling more consistent to that of a woman's name—to throw off his supervising probationary officer. *Id.* The two kept in telephone contact and, sometime in approximately November of 2011, Defendant and Mannino met for drinks at a bar, where the two discussed the possibility of committing a crime. *Id.* ¶ 4.

In the early afternoon of Tuesday, December 29, 2011, Defendant and Mannino discussed "the possibility of looking into some banks." *Id.* ¶ 5. Later that afternoon, Mannino drove his Lexus to the home of Defendant's mother. *Id.* ¶¶ 5–6. When Mannino entered the home, he saw Defendant packing a dickey (a false shirtfront) and a pair of black sweatpants with white stripes down the sides into a duffle bag. *Id.* Mannino then found a small yellow gift bag with a rope handle to bring along, in case the two decided to rob a bank. *Id.*

Defendant and Mannino drove around in Mannino's Lexus, with Mannino driving and Defendant sitting in the front passenger seat. *Id.* ¶ 6. The two men shopped for banks that lacked the protection of bulletproof windows at teller stations. *Id.* They settled on the Capital One Bank on New Utrecht and 72nd Street, because it did not have bulletproof windows and

because Defendant had successfully robbed the bank before. *Id.* Later, at Defendant's trial, Mannino testified Defendant boasted that "he had robbed that bank previously some years back and it was successful. He got caught but he got away with it." Trial Tr. 448–559.

Defendant and Mannino proceeded to plan the robbery while driving to the Capital One Bank. PSR ¶ 7. Defendant announced he would hold everyone down with a gun and Mannino would jump the counter. *Id.* Defendant, having past experience robbing this Capital One Bank, informed Mannino that although the tellers would lock their bank drawers, Mannino simply needed to ask the tellers to open the drawers. *Id.*

Defendant and Mannino circled the block a few times to study the bank. *Id.* ¶ 8. Mannino parked his Lexus after observing a few customers occupying the bank, then got ready for the robbery. *Id.* Mannino put on the black sweatpants with the white stripes down the sides, took off his white Nike sneakers for a darker pair of sneakers, and switched leather jackets, draping his black leather jacket on the back seat of the Lexus. *Id.* Defendant pulled the dickey over his head, put on a hoodie, and loaded a round into the chamber of a black automatic gun before stowing it in his waistband. *Id.* By this time, approximately 5:55 P.M., it was dark outside. *Id.* ¶¶ 9–10. Defendant and Mannino stepped out of the car and strolled towards the bank. *Id.* Defendant asked Mannino if he was ready; Mannino was. *Id.*

Defendant and Mannino burst into the bank and yelled, "Get down, get down." *Id.* ¶ 10. Defendant pulled out the loaded gun, cocked the gun, and pointed it at one of the two tellers. *Id.* Mannino jumped the teller station counter, removed $5,658.00 from the teller's drawer, and placed the money into the small yellow gift bag with the rope handle. *Id.* In the mist of the robbery, an unknowing customer entered the bank and immediately fled after seeing the gun

pointed at one of the two tellers. *Id.* The customer ran to a Laundromat parking lot across the street, where he called 911. *Id.*

Defendant and Mannino retreated to Mannino's Lexus and drove down New Utrecht Avenue. *Id.* ¶ 11. At this time, red-and-blue police lights were flashing and sirens blaring from police cars. *Id.* Mannino believed the police sirens were coming from New Utrecht Avenue, so he attempted to reverse his Lexus down 72nd Street. Gov't Sentencing Mem. at 2. Mannino pushed the gas pedal to the floor, blowing the transmission and forcing the two bank robbers to abandon the vehicle near the corner of 72nd Street and 18th Avenue and to proceed with their escape by foot. *Id.* In the urgency of their flight, Defendant and Mannino abandoned several items in the car. *Id.* ¶ 12.

At approximately 6:47 P.M., the NYPD responded to a radio call concerning a suspicious automobile parked on the corner of 72nd Street and 18th Avenue. *Id.* (reporting 72nd Street and 17th Avenue). Upon learning the vehicle was registered to Mannino, a serial bank robber, the NYPD immediately commenced a manhunt for Mannino. PSR ¶ 13.

The FBI impounded the vehicle and transported it to an offsite facility. Gov't Mem. at 3. Members of the FBI Evidence Response Team examined the car under sterile conditions. PSR ¶ 13. The agents recovered, among other things, (1) a BlackBerry telephone with multiple incoming calls from and outgoing calls to "Gari," (2) a black baseball cap with Defendant's DNA, (3) a black vest with grey fleece lining with Defendant's DNA, (4) a pack of Newport cigarettes, (5) a pair of white Nike sneakers, (6) a black leather jacket, (7) a personal phonebook, and (8) a wallet containing, among other things, a driver's license bearing the name Jack Mannino. *Id.* ¶ 12.

On January 2, 2012, after locating the residence of Defendant's mother, investigative agents interviewed Defendant in their vehicle. *Id.* ¶ 14; Gov't Sentencing Mem. at 3. The agents asked Defendant if he knew anyone by the name of "Jack," to which Defendant replied, "No." PSR ¶ 14. The agents then presented Defendant with a photograph of Mannino, and Defendant reported that the picture was of Jack Mannino, an individual with whom Defendant had been previously incarcerated. *Id.* Agents also learned from Defendant that the two had last met "four or five days ago," that Mannino had picked up Defendant at "Mr. Tires" on Coney Island Avenue, and that Defendant smoked Newports. *Id.*; Gov't Sentencing Mem. at 3.

Defendant was arrested on February 27, 2012 and taken into federal custody on February 28, 2012. Defendant has had two incidents while in federal custody: (1) giving/accepting money without authorization, resulting in a 180 day loss of telephone and (2) possessing a dangerous weapon, resulting in forty days disciplinary good conduct, sixty days disciplinary segregation, and 180 days loss of telephone. *Id.* ¶ 60.

### 2. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

### a. Reflecting the Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment

The Court finds a significant sentence necessary to accomplish the purposes of reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

### b. Affording Adequate Deterrence to Criminal Conduct

"Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence." *Davis*, 2010 WL 1221709, at *2. The Court finds a significant sentence of incarceration necessary to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B).

### c. Protecting the Public from Further Crimes of the Defendant

A significant sentence also protects the public from further crimes of Defendant, which have escalated in danger and sophistication over the years.

### d. Providing Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

Defendant's drug problem is a major factor contributing to his life of crime. The Court's significant sentence is crafted, both, to punish Defendant for his crime and to break Defendant's addiction. The Court also takes Defendant's education endeavors in crafting Defendant's sentence.

### 3. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to discuss "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

For Count One, Robbery of Capital One Bank, Defendant faces a maximum term of imprisonment of twenty-five years, 18 U.S.C. § 2113(a); a maximum term of supervised release

of five years, 18 U.S.C. § 3583(b)(1); a maximum fine of $250,000.00, 18 U.S.C. § 3571(b); and a mandatory special assessment of $100.00, 18 U.S.C. § 3013.

For Count Two, Using and Carrying a Firearm, Defendant faces a minimum term of imprisonment of seven years and a maximum term of imprisonment of life, consecutive to any other term of imprisonment imposed. 18 U.S.C. § 924(c)(1)(A)(ii). Defendant also faces supervised release of not more than five years, 18 U.S.C. § 3583(b)(1); a maximum fine of $250,000.00, 18 U.S.C. § 3571(b); and a mandatory special assessment of $100.00, 18 U.S.C. § 3013.

Furthermore, Defendant's multiple terms of supervised release shall run concurrently. 18 U.S.C. § 3624(e). He is ineligible for probation, because 18 U.S.C. § 3651(a)(2) expressly precludes probation for Counts One and Two. *See* 18 U.S.C. § 3651(a)(2). Defendant further faces restitution in the amount of $5,658.00, pursuant 18 U.S.C. § 3663A, which shall be due and owing to Capital One, 7120 New Utrecht Avenue, Brooklyn, New York 11228. According to the Presentence Investigation Report, Defendant is unable to pay. PSR ¶ 95.

### 4. The Kinds of Sentence and the Sentencing Range Established For Defendant's Offenses

The fourth § 3553(a) factor requires the Court to detail "the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." 18 U.S.C. § 3553(a)(4)(A).

Defendant was convicted of two counts that cannot be grouped together under Guidelines § 3D1.2: Robbery of Capital One Bank ("Count One") and Using and Carrying a Firearm ("Count Two"). Count One, a violation of 18 U.S.C. § 2113(a), carries a base offense level of twenty. U.S.S.G. § 2B3.1. A two-level enhancement is warranted, because Defendant took property from a financial institution. U.S.S.G. § 2B3.1(b)(1). The adjusted offense level for

Count One is thus twenty-two. Count Two is a violation of 18 U.S.C. § 924(c)(1)(A)(ii). Guidelines § 2K2.4(a) directs the term of imprisonment to be that required by statute: a minimum seven-year consecutive term of imprisonment. U.S.S.G. § 2K2.4(a).

Taking into account Defendant's extensive criminal history, the Guidelines calculate a criminal history score of nine, which includes a two-point enhancement because Defendant committed this bank robbery while on lifetime parole. PSR ¶¶ 38–39. Accordingly, Defendant's total criminal history score is nine, which places him in criminal history category IV. PSR ¶ 40.

With an adjusted offense level of twenty-two and a criminal history category of IV, the Guidelines suggest 63 to 78 months imprisonment for Count One and a mandatory seven-year term of imprisonment for Count Two. This results in an advisory Guidelines sentencing range of 147 to 162 months. Furthermore, the Guidelines suggest a term of supervised release of two years to five years for Count One, a Class B Felony, and a term of supervised release of two years to five years for Count Two, a Class A Felony. U.S.S.C. § 5D1.2(a)(1). Because probation is expressly precluded by statute for both Counts One and Two, Defendant is ineligible for probation. U.S.S.G. § 5B1.1(b)(2). The Guidelines suggest a fine ranging between $7,500.00 and $75,000.00, along with the costs of prosecution, which shall be imposed on Defendant as required by statute. U.S.S.G. § 5E1.2(c)(3); U.S.S.G. § 5E1.5. Finally, restitution must, and shall, be ordered. U.S.S.G. § 5E1.1.

Defense counsel, with the agreement of the Government, requests a term of incarceration within the 147 and 162 month Guidelines range. Def. Resentencing Mem. at 1, ECF No. 116. The Government initially submitted to the Court that "the applicable Guidelines range does not fully encompass the defendant's conduct. The defendant previously robbed the same bank in 2000 and, in his words 'got away with it.' Far from being deterred by his prior term of

incarceration, the defendant twice violated the terms of his supervised release and then planned and committed the instant crime." Govt. Sentencing Mem. at 7, ECF No. 86. On resentencing, however, the Government altered its view. Now, the Government believes a Guidelines sentence of between 147 and 162 months appropriate because of Defendant's post-sentence rehabilitative efforts and his "willingness to accept responsibility" for the crime for which a jury had convicted him. Govt. Resentencing Mem. at 1, ECF No. 117.

### 5. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor, which requires the Court to evaluate "any pertinent policy statement issued by the Sentencing Commission . . . and that . . . is in effect on the date the defendant is sentenced," 18 U.S.C. § 3553(a)(5), is not relevant in this case.

### 6. The Need to Avoid Unwarranted Sentence Disparities

The next § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Defendant was convicted of Robbery of Capital One Bank in violation of 18 U.S.C. §§ 2113(a) and 2113(d) ("Count One") and Using and Carrying a Firearm in violation of 18 U.S.C. § 924(c)(1)(A)(ii) ("Count Two"). Count One carries a maximum of twenty-five years imprisonment; Count Two, a maximum of life imprisonment. The Court's sentence falls within the range of sentences set forth by Congress and the President. These statutory provisions adequately avoid disparities with other federal sentences that recognize the severity of Defendant's crime.

In addition, "[t]he New York state statute, while not directly applicable, provides a useful indication of how this crime would be treated" under state law. *United States v. Ferranti*, 928 F.

Supp. 206, 214 (E.D.N.Y. 1996) (Weinstein, J.). Under New York law, Defendant would be guilty of Robbery in the First Degree. *See* N.Y. Penal § 160.15. Defendant forcibly entered a bank with Mannino armed with a loaded firearm and displayed the loaded firearm to threaten the people in the bank. *See id.* Robbery in the First Degree is a class B felony, subject to a maximum term of twenty-five years of incarceration. *Id.*; N.Y. Penal Law § 70.00. Defendant would also be guilty of Criminal Possession of a Weapon in the Second Degree for carrying a loaded firearm in a place that is not Defendant's home or place of business. *See* N.Y. Penal Law § 265.03. Criminal Possession of a Weapon in the Second Degree is a class C felony, subject to a maximum term of fifteen years of incarceration. *Id.*; N.Y. Penal Law § 70.00. Thus, taking both crimes together, Defendant would, under New York law, face a maximum term of imprisonment of forty years of incarceration. Accordingly, the Court's sentence falls within the sentencing range available under New York law.

### 7. The Need to Provide Restitution

Lastly, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). The Mandatory Victim Restitution Act of 1996, 18 U.S.C. § 3663A, applies to Defendant's offense and restitution shall be ordered. U.S.S.G. § 5E1.1. Restitution in the amount of $5,658.00, pursuant to 18 U.S.C. § 3663A, shall be due and owing to Capital One, 7120 New Utrecht Avenue, Brooklyn, New York 11228. An Affidavit of Loss was submitted to the victim of Defendant's crime, but no response has been received. PSR ¶ 17.

## CONCLUSION

A sentence of 78 months of incarceration for Count One, seven years of incarceration for Count Two, to be followed by five years of supervised release with special conditions, with a fine in the amount of $5,658.00, and the $100.00 mandatory assessment fee, is sufficient but no greater than necessary to accomplish the purposes of 18 U.S.C. § 3553(a)(2).

The Court expressly adopts the factual findings of the Presentence Investigation Report.

**SO ORDERED.**

s/WFK
_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: November 4, 2016
      Brooklyn, New York